JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

**DEFENDANTS**
Richard Giovanelli, M.D., et. al. (see attachment for complete list of Defendants)

**(b)** County of Residence of First Listed Plaintiff   McLean County, Illinois
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Broward County, Florida
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Goldberg, Miller & Rubin, P.C.
121 South Broad Street, Suite 1500
Philadelphia  PA  19107  (215) 735-3994

Attorneys *(If Known)*
Unknown

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane — ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability — ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander — Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' — Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | Liability — ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 840 Trademark | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 340 Marine — ☐ 345 Marine Product Liability | | **LABOR** — **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle — **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle — ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | Product Liability — ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal — ☐ 380 Other Personal | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | Injury — Property Damage | Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury - — ☐ 385 Property Damage | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| | Med. Malpractice — Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** — **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights — ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 220 Foreclosure | ☐ 441 Voting — Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment — **Habeas Corpus:** | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ — ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | Accommodations — ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - — ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | Employment — ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 446 Amer. w/Disabilities - — ☐ 555 Prison Condition | | | |
| | Other — ☐ 560 Civil Detainee - | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education — Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. §1964, et. seq.
Brief description of cause:
Violation of Racketeer Influenced and Corrupt Organizations ("RICO") Act; Common Law Fraud, Unjust Enrich.

**VII. REQUESTED IN COMPLAINT:**
- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $ 1,659,773.00
- CHECK YES only if demanded in complaint:
- JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  07/06/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, _Cy Goldberg, Esquire_____, counsel for _State Farm Mut. Auto. Ins. Co._, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

- ☒ monetary damages sought are in excess of $150,000, exclusive of interest and costs,

- ☐ the complaint seeks injunctive relief,

- ☐ the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.)   Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County: _No_____

2.)   If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? _No_____

b) Did the events of omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? _Yes_____

If your answer to question 2 (b) is "No", does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? _No_____
(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
☒ Yes          ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
☐ Yes   (If yes, please explain)   ☒ No

I certify the accuracy of all information provided above.

Signature: _____

## ATTACHMENT TO CIVIL COVER SHEET

**Complete List of Defendants**

Richard P. Giovanelli, M.D.
Matthew Miller, M.D.
Iqbal Merchant, M.D.
Royal Medical, P.C.
Rego Park Medical Services, P.C.
Rego Park Medical Care, P.C.
Meridian Acupuncture Care, P.C.
Richard Amato, D.C.
Frederick Giovanelli, D.C., individually and d/b/a Village Chiropractic
Janell Health Management Services, Inc., individually and d/b/a Village Chiropractic

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **STATE FARM MUTUAL AUTOMOBILE** | : | |
| **INSURANCE COMPANY,** | : | |
| | : | **CIVIL ACTION:** |
| **Plaintiff,** | : | **Docket No.:** |
| vs. | : | |
| | : | |
| **RICHARD P. GIOVANELLI, M.D.,** | : | **Plaintiff Demands a** |
| **MATTHEW MILLER, M.D.,** | : | **Trial by Jury** |
| **IQBAL MERCHANT, M.D.,** | : | |
| **RICHARD AMATO, D.C.,** | : | |
| **FREDERICK GIOVANELLI, D.C.,** | : | |
| **d/b/a VILLAGE CHIROPRACTIC** | : | |
| **MERIDIAN ACUPUNCTURE CARE, P.C.,** | : | |
| **ROYAL MEDICAL, P.C.,** | : | |
| **REGO PARK MEDICAL SERVICES, P.C.,** | : | |
| **REGO PARK MEDICAL CARE, P.C.,** | : | |
| **JANELL HEALTH MANAGEMENT** | : | |
| **SERVICES, INC.** | : | |
| **d/b/a VILLAGE CHIROPRACTIC,** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

Plaintiff, State Farm Mutual Automobile Insurance Company ("State Farm" or

"Plaintiff"), by and through its counsel, Goldberg, Miller & Rubin, P.C., bring this action against

Richard P. Giovanelli, M.D., Matthew Miller, M.D., Iqbal Merchant, M.D., Royal Medical, P.C.,

Rego Park Medical Services, P.C., Rego Park Medical Care, P.C., Meridian Acupuncture Care,

P.C., Richard Amato, D.C., Frederick Giovanelli, D.C., individually and d/b/a Village

Chiropractic and Janell Health Management Services, Inc., individually and d/b/a Village

Chiropractic and allege violations of the Racketeering Influenced and Corrupt Organizations Act

(RICO) along with claims for common law fraud, unjust enrichment and declaratory judgment.

In support of its claims, Plaintiff hereby alleges the following:

**NATURE OF THE ACTION**

1.     This action seeks to recover more than $1,659,773.00 that the Defendants wrongfully obtained from State Farm since April 4, 2002 by submitting, and causing to be submitted, thousands of fraudulent No-Fault bills relating to healthcare services (i.e., initial and follow-up orthopedic and neurological consultations, diagnostic testing, acupuncture, chiropractic treatment, physical therapy, and medical testing and treatment)(collectively the "Fraudulent Services") that purportedly were provided to persons, including State Farm insureds, involved in New York automobile accidents ("Insureds").

2.     In addition, State Farm seeks a declaration that it is not legally obligated to pay reimbursement of more than $500,000.00 in pending claims that have been submitted through Defendants Royal Medical, P.C. ("Royal Medical"), Rego Park Medical Services, P.C. ("RPMS"), and Rego Park Medical Care, P.C. ("RPMC")(collectively the "PC Defendants") because:

(i)     the PC Defendants are fraudulently incorporated, owned and controlled by non-physicians and, therefore, are ineligible to recover No-Fault benefits;

(ii)    the PC Defendants engage in unlawful fee splitting with non-physicians and, therefore, are ineligible to recover No-Fault benefits; and

(iii)   the PC Defendants purport to be owned by physicians who do not practice medicine through the PC Defendants and, therefore, are ineligible to recover No-Fault benefits.

3.     The Defendants fall into the following categories:

(i)     The PC Defendants are fraudulently incorporated New York professional corporations, through which the Fraudulent Services purportedly are performed and billed to insurance companies, including State Farm, to collect No-Fault benefits;

(ii)    Defendant Richard P. Giovanelli, M.D. ("Dr. Giovanelli") falsely purports to own the PC Defendants;

(iii)    Defendant Matthew Miller, M.D. ("Dr. Miller") falsely purported to own Defendants Royal Medical and RPMS. Defendant Miller also allows others to prepare in his name fraudulent bills, medical reports and other medical records to be submitted to insurance companies, including State Farm, to collect No-Fault benefits;

(iv)    Defendant Iqbal Merchant, M.D. ("Dr. Merchant") prepares, or allows others to prepare in his name, fraudulent bills, medical reports, testing results and other medical records to be submitted to insurance companies, including State Farm, to collect No-Fault benefits;

(v)    Defendant Richard Amato, D.C. ("Dr. Amato") is a chiropractor that prepares, or allows others to prepare in his name, fraudulent bills and chiropractic records for Fraudulent Services to be submitted to insurance companies, including State Farm, to collect No-Fault benefits;

(vi)    Defendant Frederick Giovanelli, D.C. ("F. Giovanelli") is a chiropractor, not a physician, and never has been licensed to practice medicine in New York. F. Giovanelli secretly owns and controls the PC Defendants in violation of New York law. He also controls Meridian Acupuncture, P.C. and operates through the fictitious name Village Chiropractic;

(vii)    Defendant Meridian Acupuncture Care, P.C. ("Meridian") is a New York professional corporation, controlled by F. Giovanelli through which Fraudulent Services purportedly are performed and billed to insurance companies, including State Farm, to collect No-Fault benefits;

(viii)    Defendant Janell Health Management Services, Inc. ("Janell") is an entity that is owned and controlled by F. Giovanelli and has been used by F. Giovanelli to: (a) facilitate his unlawful ownership of and control over the PC Defendants and Meridian; (b) operate a fraudulent chiropractic center, and (c) unlawfully siphon away the revenues of the PC Defendants and Meridian to himself.

4.    As discussed below, the Defendants at all relevant times have known that: (i) neither Dr. Giovanelli nor Dr. Miller has ever truly owned or controlled any of the PC Defendants, through which charges for the Fraudulent Services have been submitted; (ii) the PC Defendants have always been secretly owned and controlled by individuals and entities that are not licensed to practice medicine; (iii) Dr. Giovanelli and Dr. Miller have not engaged in the practice of medicine through any of the PC Defendants; and (iv) the financial and operational

relationships between the Defendants have been created to allow non-physicians to secretly own and control the PC Defendants, to illegally split fees by funneling insurance proceeds paid to the PC Defendants by insurers (including State Farm) to non-physicians, and to bill for unnecessary acupuncture, physical therapy, chiropractic treatment, medical testing, treatment and consultations, and diagnostic testing. As such, the Defendants never have had any right to be compensated for the Fraudulent Services.

5.      The Defendants' series of interrelated schemes began in 1997 and has continued since that time. As a result of the Defendants' scheme, State Farm has incurred damages exceeding $1,659,773.00 since April 4, 2002.

## THE PARTIES

### I.      Plaintiff

6.      Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm") is an Illinois corporation with its principal place of business in Bloomington, Illinois. State Farm is authorized to conduct business and to issue automobile insurance policies in New York. State Farm provides insurance coverage to their customers in New York for, *inter alia*, medical payments, uninsured motorist benefits, underinsured motorist benefits and liability for bodily injury arising out of automobile accidents.

### II.     Defendants

#### A.      The Nominal Owner Defendants

7.      Defendant Dr. Giovanelli is a physician who has been licensed to practice medicine in New York and in Florida since 1976. Though Dr. Giovanelli is licensed to practice medicine in New York, he resides in and is a citizen of Florida. Dr. Giovanelli has served as the nominal or straw owner of the PC Defendants. In other words, he is not the true owner.

8.      Defendant Dr. Miller is a physician who was licensed to practice medicine in New York since October 1981. Dr. Miller resides in and is a citizen of New York, and has served as the nominal or straw owner of Defendants Royal Medical and RPMS.

9.      In September 1998 (the "September 1998 Order"), Dr. Miller's medical license was suspended for three years; however, the suspension was stayed and Dr. Miller's license was placed on probation for three (3) years.

10.     In July 2004 (the "July 2004 Order"), Dr. Miller's medical license was suspended for three (3) years. Two (2) months of the suspension was to be served as an actual suspension, the remaining thirty-four (34) months of the suspension was stayed, and Dr. Miller was placed on probation.

**B.      The PC Defendants**

11.     Defendant Royal Medical is a New York medical professional corporation with its principal place of business in Queens, New York, which was fraudulently incorporated on or about March 17, 1998, has been owned on paper by Dr. Giovanelli and Dr. Miller, but in actuality always has been owned and controlled by unlicensed non-physicians in contravention of New York law.

12.     Defendant RPMS is a New York medical professional corporation with its principal place of business in Queens, New York, which was fraudulently incorporated on or about November 21, 2005, has been owned on paper by Dr. Giovanelli and Dr. Miller, but in actuality always has been owned and controlled by unlicensed non-physicians in contravention of New York law.

13.     Defendant RPMC is a New York medical professional corporation with its principal place of business in Queens, New York, which was fraudulently incorporated on or

about April 20, 2009, has been owned on paper by Dr. Giovanelli, but in actuality always has been owned and controlled by unlicensed non-physicians in contravention of New York law.

### C.   The Management Defendants

14.     Defendant F. Giovanelli resides in and is a citizen of New York.  F. Giovanelli is a chiropractor, not a physician, and never has been licensed to practice medicine.  Nonetheless, F. Giovanelli secretly has owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

15.     Defendant Janell is a New York corporation with its principal place of business in Queens, New York, which was incorporated in New York on or about November 20, 1997, shortly before Royal was fraudulently incorporated in early 1998, and has operated from the same locations that the PC Defendants have purported to operate.  Janell is owned and controlled by F. Giovanelli, and has been used by F. Giovanelli to illegally own and control the PC Defendants, and to unlawfully siphon the PC Defendants' revenues to non-physicians.

### D.   The Other Defendants

16.     Defendant Dr. Merchant is a physician who was licensed to practice medicine in New York since 1983.  Dr. Merchant resides in and is a citizen of New York.  He is a medical doctor that prepares, or allows others to prepare in his name, fraudulent bills, medical reports, testing results and other medical records to be submitted to insurance companies, including State Farm, to collect No-Fault benefits.

17.     Defendant Dr. Amato is a chiropractor who was licensed to practice in New York since August 21, 1992.  Dr. Amato resides in and is a citizen of New York.  He is a chiropractor that prepares, or allows others to prepare in his name, fraudulent bills and chiropractic records

for Fraudulent Services to be submitted to insurance companies, including State Farm, to collect No-Fault benefits.

18.     Defendant Meridian is a New York professional corporation with its principal place of business in New York, which was incorporated in Queens, New York on or about February 5, 1999.  It is controlled by F. Giovanelli through which Fraudulent Services purportedly are performed and billed to insurance companies, including State Farm, to collect No-Fault benefits.

<b><u>JURISDICTION AND VENUE</u></b>

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 whereas a federal question is at issue, based upon the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1964(c).

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**I.**     **An Overview of the No-Fault Laws and Licensing Statutes**

22.     State Farm underwrites automobile insurance in the State of New York.

23.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive necessary health care services.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services.

25.     An Insured can assign his/her right to No-Fault Benefits to health care service providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for ***medically necessary*** services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

26.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they were unlawfully incorporated.  In New York, only a licensed physician may: (i) practice medicine; (ii) own and control a professional corporation authorized to operate a medical practice; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician

8

services.  Unlicensed individuals may not: (i) practice medicine; (ii) own or control a professional corporation authorized to operate a medical practice; (iii) employ or supervise physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

27.     Pursuant to the No-Fault Laws, healthcare providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting with unlicensed individuals or entities as it is prohibited by, *inter alia*, New York's Education Law.

28.     Additionally, New York law requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed.  Under the No-Fault Laws, a professional corporation is not eligible to receive No-Fault Benefits if it is owned by a physician who does not actually engage in the practice of medicine through the professional corporation.

29.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….

30.     Pursuant to New York State Insurance Law § 403, the NF-3 and HCFA-1500 Forms submitted by a healthcare provider to State Farm, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

9

## II.   The Fraudulent Incorporation and Operation of the PC Defendants

31.     Beginning in late 1997, and continuing through to the present, the Defendants devised and implemented an interrelated, complex fraudulent scheme in which the PC Defendants – three medical professional service corporations nominally owned on paper by Dr. Giovanelli and/or Dr. Miller, but actually illegally owned and controlled by non-physicians – have been used to bill and collect from the New York automobile insurance industry, including State Farm, funds that they never were eligible to receive.

### A.     The Fraudulent Incorporation and Operation of Royal Medical

32.     The Defendants' fraudulent scheme commenced in late 1997, when F. Giovanelli incorporated Janell as a vehicle through which he could unlawfully own and control a medical professional corporation.

33.     Once Janell was incorporated, the Management Defendants commenced a search for a physician who would be willing to permit them to use his/her medical license so that they could fraudulently incorporate Royal Medical and use it to submit large-scale fraudulent billing to State Farm and other insurers.

34.     In about early 1998, the Management Defendants recruited Gareth Wayne Lovett, M.D. ("Dr. Lovett"), a licensed physician who was willing to permit them to use his medical license so that the Management Defendants could fraudulently incorporate Royal Medical.

35.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority permitting Royal Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Lovett. In early 1998, Dr. Lovett agreed to represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder,

10

director and officer of Royal Medical and that he truly owned, controlled and practiced through the professional corporation when this was false.

36.     Once Royal was fraudulently incorporated on or about March 17, 1998, Dr. Lovett conceded true beneficial ownership and control over the professional corporation to the Management Defendants.

37.     The Management Defendants – rather than Dr. Lovett – provided all start-up costs and investment in Royal Medical. Dr. Lovett did not incur any costs to establish Royal Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

38.     Thereafter, the Management Defendants caused Royal Medical to commence operations from several locations that they controlled – including 61-35 Woodhaven Boulevard, Rego Park, New York (the "Woodhaven Boulevard Facility") and 226 East Fordham Road, Suite 212, Bronx, New York (the "Fordham Road Facility"). The Management Defendants held the leases at these locations, and operated chiropractic practices at these locations.

39.     To further facilitate their unlawful ownership interest in and control over Royal Medical, the Management Defendants arranged for Royal Medical to use the same telephone number as the chiropractic practice owned by F. Giovanelli that also operated from the Woodhaven Boulevard Facility. F. Giovanelli's chiropractic practice does business under the fictitious name Village Chiropractic.

40.     Dr. Lovett never was the true shareholder, director, or officer of Royal Medical, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Royal Medical rested at all times entirely with the Management

11

Defendants, who used the façade of Royal Medical to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

41.     Throughout the course of Dr. Lovett's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Royal Medical was vested entirely with the Management Defendants.

42.     During his tenure as the straw owner of Royal Medical under the control of the Management Defendants, Dr. Lovett never was anything more than a de facto employee of the Management Defendants.

43.     To conceal their true ownership and control of Royal Medical while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Lovett and Royal Medical enter into an agreement(s) with themselves.  The agreement(s) called for exorbitant payments from Royal Medical, in amounts exceeding Royal Medical's actual revenues, to the Management Defendants.

44.     While the agreement(s) ostensibly were created to permit the Management Defendants to provide leaseholds, management, marketing, and billing services, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Royal Medical; and (ii) to siphon all of the profits that were generated by the billings submitted to State Farm and other insurers through Royal Medical.

45.     The net effect of these agreements between Dr. Lovett, Royal Medical, and the Management Defendants was to maintain Royal Medical in a constant state of debt to the

12

Management Defendants, thereby enabling them to maintain total control over the professional corporation, its accounts receivables, and any profits that might be generated.

46.     On about June 24, 1999, Dr. Lovett entered into a consent agreement with the State Board whereby he agreed – among other things – that: (i) he would keep the State Board advised of his current residence, employment, and medical practice; (ii) his medical practice would be closely monitored and supervised by another physician approved by the State Board; and (iii) his sobriety would be subject to consistent and intrusive monitoring.

47.     Nevertheless, Dr. Lovett: (i) secretly moved to Georgia and accepted employment there; (ii) failed to use a sobriety monitor; and (iii) failed to retain or use a physician approved by the State Board to monitor and supervise his medical practice.

48.     By Order dated March 31, 2000, the State Board determined that Dr. Lovett's continued practice of medicine in New York posed an imminent danger to public health. Accordingly, the State Board summarily suspended Dr. Lovett's right to practice medicine in New York.

49.     By Order dated June 10, 2000 (the "June 2000 Order"), the State Board permitted Dr. Lovett to surrender his medical license, and struck Dr. Lovett's name from the roster of physicians in New York.

50.     While Dr. Lovett's substance abuse problems did not prevent the Management Defendants from using him to conceal their unlawful ownership interest in and control over Royal Medical, the June 2000 Order posed a threat to their unlawful scheme as it required Dr. Lovett to divest himself of his financial interests in any medical professional corporations, and to dissolve or sell any medical professional corporations in which he was the sole shareholder, within 90 days.

13

51.     The June 2000 Order, therefore, forced the Management Defendants to either dissolve Royal Medical, or else immediately locate another physician who could replace Dr. Lovett as the nominal or straw owner of Royal Medical.

52.     The Management Defendants decided to continue operating Royal Medical.

53.     Without consulting with Dr. Lovett in making their decision to continue operating Royal Medical, in early September 2000, the Management Defendants recruited Dr. Miller and Dr. Giovanelli.  Dr. Miller and Dr. Giovanelli – like Dr. Lovett before them – were willing to permit the Management Defendants to use their medical licenses so that the Management Defendants could continue to unlawfully own and control Royal Medical.

54.     Dr. Giovanelli, who resided in Florida, was amenable to the scheme because he is F. Giovanelli's cousin, and because, upon information and belief, the Management Defendants offered to pay him to serve as a nominal or straw owner of Royal Medical even though he would not be required to actually practice medicine through or perform any work for the professional corporation.

55.     Dr. Miller was amenable to the scheme because the September 1998 Order had become a matter of public record.

56.     In exchange for a designated salary or other form of compensation, upon information and belief, in September 2000 Dr. Miller and Dr. Giovanelli, therefore, agreed to sign share transfer agreements provided by the Management Defendants, whereby Dr. Lovett's nominal interest in Royal Medical was transferred to Dr. Miller and Dr. Giovanelli.

57.     In the paperwork filed with the New York licensing authorities evidencing the transfer of Royal Medical shares from Dr. Lovett, Dr. Miller and Dr. Giovanelli also agreed to represent that they were the true shareholders, directors and officers of Royal Medical

14

and that they truly owned, controlled and practiced through the professional corporation even though this was false.

58.     Dr. Miller and Dr. Giovanelli did not pay Dr. Lovett any money to acquire the shares in Royal Medical, did not invest any of their own money in order to own or operate Royal Medical, and did not review any of Royal Medical's books or records prior to obtaining Dr. Lovett's nominal interest in Royal Medical pursuant to the share transfer agreements provided by the Management Defendants.

59.     Furthermore, prior to signing the share transfer agreements, Dr. Miller and Dr. Giovanelli did not review the management, marketing, lease, billing, and collections agreements between Royal Medical and the Management Defendants.

60.     The share transfer agreements did not affect Royal Medical's pre-existing, exorbitant obligations to the Management Defendants.  Rather, Royal Medical's exorbitant obligations to the Management Defendants continued despite the fact that Dr. Miller and Dr. Giovanelli had assumed straw ownership of Royal Medical in place of Dr. Lovett.  Dr. Miller and Dr. Giovanelli did not know what services – if any – the Management Defendants provided in exchange for these exorbitant payments.

61.     Following the September 2000 share transfer, the Management Defendants continued to use the management, marketing, lease, billing, and collections agreements with Royal Medical solely as a tool to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Royal Medical; and (ii) to siphon all of the profits that were generated by the billings submitted to State Farm and other insurers through Royal Medical.

62.     Following the September 2000 share transfer, Royal Medical continued to operate from the Woodhaven Boulevard Facility and Fordham Road Facility, where the Management Defendants held the leases and operated their chiropractic practices.

63.     Following the September 2000 share transfer, Royal Medical continued to use the same telephone number as Village Chiropractic, the chiropractic practice owned by F. Giovanelli that also operated from the Woodhaven Boulevard Facility.

64.     Like Dr. Lovett before them, Dr. Miller and Dr. Giovanelli never were the true shareholders, directors, or officers of Royal Medical, and never had any true ownership interest in or control over the professional corporation.  True ownership and control over Royal Medical rested at all times entirely with the Management Defendants, who have used the façade of Royal Medical to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

65.     As was the case during Dr. Lovett's tenure as straw owner of Royal Medical, throughout the course of Dr. Miller's and Dr. Giovanelli's relationship with the Management Defendants, all decision-making authority relating to the operation and management of Royal Medical has been vested entirely with the Management Defendants.

66.     Dr. Miller did not know the most basic facts regarding Royal Medical.

67.     Neither Dr. Miller nor Dr. Giovanelli actually practiced medicine through Royal Medical.

68.     During their tenure as the straw owners of Royal Medical under the control of the Management Defendants, Dr. Miller and Dr. Giovanelli never have been anything more than de facto employees of the Management Defendants.

16

69.    In mid-2008, the Management Defendants ordered Dr. Miller to sign a share transfer agreement, whereby Dr. Miller's nominal interest in Royal Medical was transferred to Dr. Giovanelli.

70.    The Management Defendants did not consult with Dr. Miller regarding the disposition of a professional corporation purportedly owned in part by Dr. Miller.  Rather, they simply advised Dr. Miller of their decision after it had been made, and Dr. Miller acceded to it – in keeping with the fact that he was nothing more than a de facto employee of the Management Defendants.

71.    Since June 2008, Dr. Giovanelli served as the sole nominal or straw owner of Royal Medical.  In actuality, however, Royal Medical continues to be secretly and unlawfully owned and controlled by the Management Defendants.

**B.    The Fraudulent Incorporation and Operation of RPMS**

72.    After unlawfully owning, controlling, and operating Royal Medical for more than seven years, in about late 2005 the Management Defendants decided to fraudulently incorporate a second professional corporation, RPMS, so that they would have a second vehicle through which to submit fraudulent No-Fault claims, and thereby perpetuate their scheme.

73.    Toward that end, the Management Defendants once again approached Dr. Miller and offered to "purchase" the use of Dr. Miller's medical license to fraudulently incorporate RPMS.

74.    Dr. Miller was willing to participate in the scheme because – by this point – not only was the September 1998 Order a matter of public record, but the July 2004 Order was a matter of public record.  Accordingly, upon information and belief, Dr. Miller continued to find it difficult to secure legitimate medical employment.

75.    As they had done with Dr. Lovett at Royal Medical, in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing RPMS to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Miller.  In exchange for a designated salary or other form of compensation, in late 2005 Dr. Miller agreed to represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of RPMS and that he truly owned, controlled and practiced through the professional corporation even though this was false.

76.    Once RPMS was fraudulently incorporated on about November 21, 2005, Dr. Miller ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

77.    The Management Defendants – rather than Dr. Miller -- provided all start-up costs and investment in RPMS. Dr. Miller did not incur any costs to establish RPMS' practice, nor did he invest any money in the professional corporation he purportedly owned.

78.    Thereafter, the Management Defendants caused RPMS to commence operations from several locations that they controlled – including the Woodhaven Boulevard Facility from which Royal Medical operated, and 2488 Grand Concourse, Suite 315, Bronx, New York (the "Grand Concourse Facility").  The Management Defendants held the leases at these locations, and operated chiropractic practices at these locations.

79.    As was the case with Royal Medical, to further facilitate their unlawful ownership interest in and control over RPMS, the Management Defendants arranged for RPMS to use the same telephone number as Village Chiropractic, a chiropractic practice owned by F. Giovanelli that also operated from the Woodhaven Boulevard Facility.

18

80.     Dr. Miller never was the true shareholder, director, or officer of RPMS, and never had any true ownership interest in or control over the professional corporation.  True ownership and control over RPMS has rested at all times entirely with the Management Defendants, who have used the façade of RPMS to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

81.     Throughout the course of Dr. Miller's relationship with the Management Defendants, all decision-making authority relating to the operation and management of RPMS was vested entirely with the Management Defendants.

82.     During his tenure as the straw owner of RPMS under the control of the Management Defendants, Dr. Miller never was anything more than a de facto employee of the Management Defendants.

83.     As they previously had done at Royal Medical, to conceal their true ownership and control of RPMS while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Miller and RPMS enter into an agreement(s) with themselves.  The agreement(s) called for exorbitant payments from RPMS, in amounts exceeding RPMS' actual revenues, to the Management Defendants.

84.     While these agreements ostensibly were created to permit the Management Defendants to provide leaseholds, management, marketing, and billing services, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own RPMS; and (ii) to siphon all of the profits that were generated by the billings submitted to State Farm and other insurers through RPMS.

19

85.     The net effect of these agreements between Dr. Miller, RPMS, and the
Management Defendants was to maintain RPMS in a constant state of debt to the Management
Defendants, thereby enabling them to maintain total control over the professional corporation, its
accounts receivables, and any profits that might be generated.

86.     In January 2006, shortly after RPMS was fraudulently incorporated, the
Management Defendants ordered Dr. Miller to sign a share transfer agreement, whereby Dr.
Miller's nominal interest in RPMS was transferred to Dr. Giovanelli.

87.     The Management Defendants did not consult with Dr. Miller regarding the
disposition of a professional corporation purportedly owned by Dr. Miller. Rather, they simply
advised Dr. Miller of their decision after it had been made, and Dr. Miller acceded to it – in
keeping with the fact that he was nothing more than a de facto employee of the Management
Defendants.

88.     Thereafter, in exchange for a designated salary or other form of compensation,
upon information and belief, Dr. Giovanelli agreed to represent, in the paperwork filed with the
New York licensing authorities evidencing the transfer of RPMS shares from Dr. Miller, that he
was the true shareholder, director and officer of RPMS and that he truly owned, controlled and
practiced through the professional corporation even though this was false.

89.     Dr. Giovanelli did not pay Dr. Miller any money to acquire the shares certificates
of RPMS, did not invest any of his own money in order to own or operate RPMS, and did not
review any of RPMS' books or records prior to obtaining Dr. Miller's nominal interest in RPMS
pursuant to the share transfer agreement provided by the Management Defendants.

90.     Furthermore, prior to signing the share transfer agreement, Dr. Giovanelli did not
review the agreement(s) between RPMS and the Management Defendants.

20

91.     The share transfer agreement did not affect RPMS' pre-existing, exorbitant

obligations to the Management Defendants. Rather, RPMS' exorbitant obligations to the

Management Defendants continued despite the fact that Dr. Giovanelli had assumed straw

ownership of RPMS in place of Dr. Miller. Dr. Giovanelli did not know what services – if any –

the Management Defendants provided in exchange for these exorbitant payments.

92.     Following the January 2006 share transfer, the Management Defendants

continued to use the agreement(s) with RPMS solely as a tool to: (i) control the day-to-day

operations, exercise supervisory authority over, and illegally own RPMS; and (ii) to siphon all of

the profits that were generated by the billings submitted to State Farm and other insurers through

RPMS.

93.     Following the January 2006 share transfer, RPMS continued to operate from the

Woodhaven Boulevard Facility and Grand Concourse Facility, where the Management

Defendants held the leases and operated their chiropractic practices.

94.     Following the January 2006 share transfer, RPMS continued to use the same

telephone number as Village Chiropractic, the chiropractic practice owned by F. Giovanelli that

also operated from the Woodhaven Boulevard Facility.

95.     Like Dr. Miller before him, Dr. Giovanelli never has been the true shareholder,

director, or officer of Royal Medical, and never has had any true ownership interest in or control

over the professional corporation. True ownership and control over RPMS has rested at all times

entirely with the Management Defendants, who have used the façade of RPMS to do indirectly

what they are forbidden from doing directly, namely to: (i) employ physicians; (ii) control their

practices; and (iii) charge for and derive an economic benefit from their services.

21

96.     As was the case during Dr. Miller's tenure as straw owner of RPMS, throughout

the course of Dr. Giovanelli's relationship with the Management Defendants, all decision making

authority relating to the operation and management of RPMS has been vested entirely with the

Management Defendants.

97.     During his tenure as the straw owner of RPMS under the control of the

Management Defendants, Dr. Giovanelli never has been anything more than a de facto employee

of the Management Defendants.

**C.      The Fraudulent Incorporation and Operation of RPMC**

98.     After unlawfully owning, controlling, and operating RPMS for approximately

three-and-a-half years, the Management Defendants, in early 2009, decided to fraudulently

incorporate a third professional corporation, RPMC, so that they would have a third vehicle

through which to submit fraudulent No-Fault claims, and thereby perpetuate their scheme.

99.     Toward that end, the Management Defendants once again approached Dr.

Giovanelli and offered to "purchase" the use of Dr. Giovanelli's medical license to fraudulently

incorporate RPMC.

100.    Dr. Giovanelli was willing to participate in the scheme because he is F.

Giovanelli's cousin and, upon information and belief, the Management Defendants offered to

pay Dr. Giovanelli to serve as the nominal or straw owner of a professional corporation without

any attendant requirement that he actually perform any work for or practice medicine through the

professional corporation.

101.    As had been the case at Royal Medical and RPMS, in order to circumvent New

York law and to induce the State Education Department to issue a certificate of authority

authorizing RPMC to operate a medical practice, the Management Defendants entered into a

22

secret scheme with Dr. Giovanelli.  In exchange for a designated salary or other form of

compensation, upon information and belief, in early 2009 Dr. Giovanelli agreed to represent in

the certificate of incorporation filed with the Department of Education, and the biennial

statements filed, thereafter, that he was the true shareholder, director and officer of RPMC and

that he truly owned, controlled and practiced through the professional corporation even though

this was false.

102.    Once RPMC was fraudulently incorporated on or about April 20, 2009, Dr.

Giovanelli ceded true beneficial ownership and control over the professional corporation to the

Management Defendants.

103.    The Management Defendants – rather than Dr. Giovanelli – provided all start-up

costs and investment in RPMC. Dr. Giovanelli did not incur any costs to establish RPMC's

practice, nor did he invest any money in the professional corporation he purportedly owns.

104.    Thereafter, the Management Defendants caused RPMC to commence operations

from several locations that they controlled – including the Woodhaven Boulevard Facility from

which Royal Medical and RPMS operated, and the Grand Concourse Facility from which RPMS

operated.  The Management Defendants continued to hold the leases at these locations, and to

operate chiropractic practices at these locations.

105.    As was the case with Royal Medical and RPMS, to further facilitate their

unlawful ownership interest in and control over RPMC, the Management Defendants have

arranged for RPMC to use the same telephone number as Village Chiropractic, a chiropractic

practice owned by F. Giovanelli that also operated from the Woodhaven Boulevard Facility.

23

106.    Dr. Giovanelli never has been the true shareholder, director, or officer of RPMC, and never has had any true ownership interest in or control over the professional corporation. True ownership and control over RPMC rested at all times entirely with the Management Defendants, who have used the façade of RPMC to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

107.    Throughout the course of Dr. Giovanelli's relationship with the Management Defendants, all decision-making authority relating to the operation and management of RPMC has been vested entirely with the Management Defendants.

108.    During his tenure as the straw owner of RPMC under the control of the Management Defendants, Dr. Giovanelli never has been anything more than a de facto employee of the Management Defendants.

109.    As they previously had done at Royal Medical and RPMS, to conceal their true ownership and control of RPMC while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Giovanelli and RPMC enter into an agreement(s) with themselves. The agreement(s) calls for exorbitant payments from RPMC, in amounts exceeding RPMC's actual revenues, to the Management Defendants.

110.    While the agreement(s) ostensibly were created to permit the Management Defendants to provide leaseholds, management, marketing, and billing services, they actually have been used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own RPMC; and (ii) to siphon

24

all of the profits that are generated by the billings submitted to State Farm and other insurers through RPMC.

111.    The net effect of the agreement(s) between Dr. Giovanelli, RPMC, and the Management Defendants has been to maintain RPMC in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the professional corporation, its account receivables, and any profits that might be generated.

112.    The ownership and control of the PC Defendants by non-physicians compromises patient care, as the provision of medical services by the PC Defendants is subject to the pecuniary interests of non-physicians as opposed to the exercise of independent medical judgment by true doctor-owners.

## III.    The Nominal Owner Defendants' Failure to Practice Medicine Through the PC Defendants

113.    N.Y. Business Corporation Law ("BCL") § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed.  BCL § 1507 provides as follows:

> **Issuance of shares**
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation … or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued …. All shares issued, agreements made, or proxies granted in violation of this section shall be void.

114.    Legislative history confirms that, for a medical professional corporation to be properly licensed, every physician owning shares in the professional corporation actually must practice medicine through the professional corporation.  For example, in commenting on the

25

proposed amendment to BCL § 1507 in 1971, the New York Education Department stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations. While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, *it maintains the basic concept of restricting ownership to professionals working within the corporation*.

(Emphasis added).

115.    Similarly, the New York Department of State commented that:

> Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice *and who so practice in such corporation or a predecessor entity*.

> The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued".

(Emphasis added).

116.    New York's Department of Health was of the same opinion, commenting that:

> The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations *to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged*....

(Emphasis added).

117.    Neither Dr. Miller nor Dr. Giovanelli has ever practiced medicine through any of the PC Defendants.

118.    Dr. Giovanelli, who resides in and is a citizen of Florida, has not maintained a residence in New York since 1983.

119.    During the periods in which he has purported to serve as a shareholder of the PC Defendants, Dr. Giovanelli has been in active medical practice in Florida, and has maintained a broad range of additional business interests in Florida, which, in fact, have left him with no time to practice medicine through the PC Defendants.

120.    Not a single one of the bills submitted through the PC Defendants to State Farm

26

represent that the underlying treatment was provided by Dr. Giovanelli.

121.    During the periods in which he has purported to serve as the owner of Royal Medical and RPMS, Dr. Miller maintained separate medical practices that left him with no time to practice medicine through Royal Medical or RPMS.

122.    Dr. Miller never provided any patient care or practical medicine through Royal Medical.

123.    In an attempt to conceal the fact that Dr. Miller never actually practiced medicine through either Royal Medical or RPMS, the Defendants routinely submitted billing which claimed that Dr. Miller provided treatment through those professional corporations. However, Dr. Miller did not actually provide the alleged provided treatments.

**IV.    The Defendants' Fraudulent Treatment Protocol**

124.    In keeping with the fact that the PC Defendants are secretly and unlawfully owned and controlled by non-physicians, the Fraudulent Services that allegedly are provided through the PC Defendants, as well as through Meridian and Village, or by the other Defendants, are not medically necessary.

125.    Rather, the Fraudulent Services are provided – to the extent that they are provided at all – by the Defendants, as part of a scheme and conspiracy, pursuant to a pre-determined protocol designed solely to enrich the Defendants, not because they are intended to benefit the Insureds who supposedly are subjected to them.

126.    Specifically, virtually every Insured who purportedly has treated through the PC Defendants is documented as receiving initial and follow-up examinations and specialty consultations, electrodiagnostic testing, and multiple rounds of physical therapy.

27

127. Virtually every Insured who purportedly has treated through the Defendants also is documented as receiving medically useless acupuncture at Meridian and chiropractic services at Village –practices owned and controlled by the Management Defendants – which are located in the same facilities from which the PC Defendants purport to operate.

128. In virtually every case, the course of treatment supposedly provided to Insureds through the Defendants is substantively identical, and is not varied based on the putative results of follow-up examinations or diagnostic testing, which in almost every case are positive.

129. Rather than properly assess the patients, identify their injuries, and provide them treatment according to the proper standard of care, the patients were and continue to be placed on a standardized and pre-determined treatment plan. The course of treatment does not vary in any substantive way across virtually every Insured who presented to the Defendants because the course of treatment that supposedly is provided to Insureds through the Defendants is designed to maximize profit for the Defendants, not to address any Insured's unique symptoms or presentment.

130. The Defendants, in support of this conspiracy and scheme to defraud State Farm, produce and submit false, misleading, and inaccurate medical records, reports, bills, statements, and other documents and representations ("False Records") to State Farm as well as others. These False Records relate to patients who presented to the Defendants after motor vehicle or other alleged accidents. Some of these patients were insured by State Farm and brought claims for personal injuries against State Farm while other patients brought claims for personal injuries against insureds of State Farm. During the relevant times, and continuing to the present, the Defendants, without the knowledge or consent of Plaintiffs, devised and participated in the scheme to defraud State Farm through the submission of the False Records. These False Records

were prepared to support claims of the Defendants and their patients against insurance companies, including State Farm, and their insureds.

131.    These False Records, including, but not limited to, the examples listed herein and in paragraph 134 were intended, and continue to be intended, to generate payment for the Defendants and did, in fact, induce payments from State Farm for treatment, testing, services and goods which, although purportedly reasonable and necessary and provided to individuals insured by State Farm, was not reasonable and necessary.

132.    These False Records were intended, and continue to be intended, to assist individuals, who claimed injuries as the result of accidents allegedly caused by individuals insured by State Farm, in obtaining payments from State Farm.  One of the purposes of creating these False Records by Defendants was to encourage the referral of patients/plaintiffs from personal injury attorneys to the Defendants.  As a result of the preparation and submission of these False Records by Defendants, State Farm was caused to make payments to these patients/plaintiffs on their bodily injury claims.

133.    These False Records were intended, and continue to be intended, to assist individuals insured by State Farm, who claimed injuries as the result of accidents allegedly caused by individuals without motor vehicle insurance (hereinafter "uninsured motorist claims") or insufficient motor vehicle insurance (hereinafter "underinsured motorist claims"), in obtaining payments from State Farm on their uninsured and underinsured motorist claims.   One of the purposes of creating these False Records by Defendants was to encourage the referral of patients/plaintiffs from personal injury attorneys to the Defendants.  As a result of the preparation and submission of these False Records, State Farm was caused to make payments to these patients/plaintiffs on their uninsured motorist claims and underinsured motorist claims.

29

134.    In furtherance of and for the purpose of executing the conspiracy and scheme to defraud, Defendants, on numerous occasions, used and caused to be used mail depositories of the United States Postal Service and wires by both placing and causing to be placed correspondence, medical bills, medical reports, medical records, statements, and other mailable matter in said depositories and by removing and causing to be removed letters and other mailable matter from said depositories and by the use of facsimile machines to send and receive correspondence, medical bills, medical reports, medical records, statements, and other documents.  The Defendants sent the false, fraudulent, misleading, and inaccurate correspondence, medical bills, medical records, medical reports, statements, and other documents to various individuals and entities, including personal injury attorneys, defense attorneys, and insurance companies including Plaintiffs.   Said use of the mails and wiring by the Defendants included, but was not limited to, the following[1]:

    (a)  Records for patient R. O. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-5605-293.  The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated August 6, 2002 to February 25, 2003.

    (b)  Records for patient R. A. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-5605-293.  The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated August 6, 2002 to November 2, 2002.

    (c)  Records for patient A. H. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and

---

[1] In order to protect the privacy of the patients of Defendants, they have been identified by initials.  The names of the patients will be provided to the Defendants.

Meridian, to State Farm concerning claim number 32-5605-293. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated August 6, 2002 to April 1, 2003.

(d) Records for patient D. P. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, and Dr. Amato to State Farm concerning claim number 32-5605-293. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, and Dr. Amato include, but may not be limited to, those dated August 13, 2002 to January 25, 2003.

(e) Records for patient C. O. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-A045-250. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated December 3, 2002 to August 19, 2003.

(f) Records for patient D. S. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-A052-179. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated September 23, 2003 to January 14, 2004.

(g) Records for patient M. R. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-A054-661. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, include, but may not be limited to, those dated January 6, 2004 to May 13, 2004.

(h) Records for patient F. D. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-V524-346. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated April 2, 2004 to December 10, 2004.

31

(i) Records for patient M. D. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian to State Farm concerning claim number 32-V524-346. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated April 5, 2004 to December 10, 2004.

(j) Records for patient J. G. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-A057-134. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated June 10, 2004 to December 28, 2004.

(k) Records for patient S. J. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian, to State Farm concerning claim number 32-A057-648. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Janell, Dr. Amato, and Meridian include, but may not be limited to, those dated August 18, 2004 to January 12, 2005.

(l) Records for patient G. R. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, Dr. Merchant, F. Giovanelli, Village, Dr. Amato, and Janell, to State Farm concerning claim number 32-V577-598. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, Dr. Merchant, F. Giovanelli, Village, Dr. Amato, and Janell include, but may not be limited to, those dated August 2, 2005 to March 28, 2006.

(m) Records for patient R. R. were sent by Defendants, RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Dr. Merchant, Dr. Amato, and Janell, to State Farm concerning claim number 32-V606-566. The records sent by RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, Village, Dr. Merchant, Dr. Amato, and Janell include, but may not be limited to, those dated December 20, 2005 to October 6, 2007.

(n) Records for patient R. R. were sent by Defendants, Royal Medical, Dr. Giovanelli, Dr. Miller, Dr. Merchant, F. Giovanelli, Village, Dr. Amato, and Janell, to State Farm concerning claim number 32-V606-566. The records sent by Royal Medical, Dr. Giovanelli, Dr. Miller, Dr. Merchant,

F. Giovanelli, Village, Dr. Amato, and Janell include, but may not be limited to, those dated December 19, 2005 to October 11, 2006.

(o) Records for patient N. M. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell, and Meridian, to State Farm concerning claim number 32-V626-228.  The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell, and Meridian include, but may not be limited to, those dated July 14, 2006 to July 13, 2007.

(p) Records for patient S. M. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Merchant, Dr. Amato, Janell, and Meridian, to State Farm concerning claim number 32-V633-572.  The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Merchant, Dr. Amato, Janell, and Meridian include, but may not be limited to, those dated August 28, 2006 to April 11, 2007.

(q) Records for patient J. S. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Merchant, Dr. Amato, Janell, and Meridian, to State Farm concerning claim number 32-V641-787.  The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Merchant, Dr. Amato, Janell, and Meridian include, but may not be limited to, those dated October 5, 2006 to May 10, 2007.

(r) Records for patient E. E. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Dr. Amato, and Janell, to State Farm concerning claim number 52-8125-439.  The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Dr. Amato, and Janell include, but may not be limited to, those dated December 14, 2006 to March 25, 2008.

(s) Records for patient L. N. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Dr. Amato, and Janell, to State Farm concerning claim number 32-V667-650.  The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Dr. Amato, and Janell include, but may not be limited to, those dated May 26, 2007 to January 24, 2008.

(t) Records for patient K. P. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell, to State Farm concerning claim number 32-V703-816.  The records sent by RPMS, Dr.

Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell include, but may not be limited to, those dated February 29, 2008 to June 10, 2009.

(u) Records for patient J. P. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell, to State Farm concerning claim number 32-V703-816. The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell include, but may not be limited to, those dated February 29, 2008 to February 11, 2009.

(v) Records for patient N. C. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Village, Dr. Amato, and Janell, to State Farm concerning claim number 52-8310-506. The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Village, Dr. Amato, and Janell include, but may not be limited to, those dated March 10, 2009 to January 12, 2010.

(w) Records for patient J. V. were sent by Defendants, RPMS, Dr. Giovanelli, Dr. Miller, Dr. Merchant, F. Giovanelli, Dr. Amato, Janell, and Meridian, to State Farm concerning claim number 32-V726-467. The records sent by RPMS, Dr. Giovanelli, Dr. Miller, Dr. Merchant, F. Giovanelli, Dr. Amato, Janell, and Meridian include, but may not be limited to, those dated July 31, 2008 to December 15, 2009.

(x) Records for patient F. L. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell, to State Farm concerning claim number 32-V748-574. The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell, include, but may not be limited to, those dated January 6, 2009 to June 3, 2009.

(y) Records for patient A. H. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, and Janell, to State Farm concerning claim number 50-8310-506. The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, and Janell include, but may not be limited to, those dated March 10, 2009 to December 1, 2009.

(z) Records for patient A. B. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Dr. Amato, Meridian, and Janell, to State

34

Farm concerning claim number 32-V762-041.  The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Dr. Amato, Meridian, and Janell include, but may not be limited to, those dated March 27, 2009 to September 21, 2010.

(aa) Records for patient L. C. were sent by Defendants, RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell, to State Farm concerning claim number 32-V761-532.  The records sent by RPMS, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell include, but may not be limited to, those dated April 6, 2009 to April 12, 2010.

(bb) Records for patient T. B. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian, to State Farm concerning claim number 32-V792-082.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian include, but may not be limited to, those dated October 20, 2009 to January 10, 2011.

(cc) Records for patient M. B. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian, to State Farm concerning claim number 32-V792-082.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian include, but may not be limited to, those dated October 19, 2009 to August 3, 2011.

(dd) Records for patient A. P. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian, to State Farm concerning claim number 52-8359-631.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian include, but may not be limited to, those dated October 23, 2009 to March 9, 2010.

(ee) Records for patient G. T. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian, to State Farm concerning claim number 32-V814-215.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian include, but may not be limited to, those dated March 1, 2010 to October 5, 2010.

(ff)  Records for patient E. U. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian, to State Farm concerning claim number 52-8426-204.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Dr. Merchant, Janell and Meridian include, but may not be limited to, those dated August 19, 2010 to April 19, 2011.

(gg) Records for patient A. R. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Village, Dr. Amato, Janell and Meridian to State Farm concerning claim number 32-V851-211.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Dr. Merchant, Village, Dr. Amato, Janell and Meridian include, but may not be limited to, those dated September 21, 2010 to December 17, 2010.

(hh) Records for patient Y. C. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Janell, Dr. Merchant, and Meridian, to State Farm concerning claim number 32-V860-098.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Janell, Dr. Merchant, and Meridian include, but may not be limited to, those dated November 6, 2010 to May 3, 2011.

(ii)  Records for patient C. H. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Janell and Meridian, to State Farm concerning claim number 32-V867-355.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Janell and Meridian include, but may not be limited to, those dated December 15, 2010 to January 17, 2012.

(jj)  Records for patient D. R. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Janell and Meridian, to State Farm concerning claim number 52-8466-838.  The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Village, Dr. Amato, Janell and Meridian include, but may not be limited to, those dated February 3, 2011 to January 17, 2012.

(kk) Records for patient C. J. were sent by Defendants, Royal Medical, Dr. Giovanelli, F. Giovanelli, Dr. Miller, Village, Dr. Amato, Janell, and Meridian, to State Farm concerning claim number 32-A046-734.  The records sent by Royal Medical, Dr. Giovanelli, F.

Giovanelli, Dr. Miller, Village, Dr. Amato, Janell, and Meridian include, but may not be limited to, those dated July 21, 2003 to October 22, 2003.

(ll) Records for patient A. P. were sent by Defendants, RPMC, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell, to State Farm concerning claim number 32-V773-063. The records sent by RPMC, Dr. Giovanelli, F. Giovanelli, Dr. Amato, Dr. Merchant, and Janell include, but may not be limited to, those dated June 23, 2009 to July 15, 2009.

The mailings were sent by the identified individuals and entities on or around the dates noted. The mailings were received by the identified individuals and entities shortly thereafter.

135.    Each use of the mailings and wires in connection with the scheme and artifice to defraud constitutes the offense of mail and wire fraud as proscribed and prohibited by 18 U.S.C. §1343.

136.    In connection with the activities of all Defendants giving rise to this action, all Defendants conspired to engage in the various activities and aided and abetted one another in the said activities as described herein.

137.    In connection with the activities of all Defendants giving rise to this action, the Defendants acted with malice, intent and knowledge. The Defendants knew that the productions and submissions were false and that the false submissions would be relied upon by Plaintiff when making payment decisions.

138.    At all times relevant hereto, Defendants knew, or should have known, that Plaintiffs were relying on the truth and accuracy of Defendants' submissions in determining amounts payable to Defendants, to uninsured and underinsured claimants and to claimants making bodily injury claims against those individuals insured by Plaintiff.

139.    Each predicate act (e.g. the submission of each false bill, report and/or record via U.S. Mail) was committed with the same purpose (to collect payment from Plaintiff and other

37

insurance companies and bolster personal injury claims), the same result (the actual collection of payments from Plaintiff for the benefit of Defendants), the same participants (the Defendants), the same victims (Plaintiff and other insurance companies), and the same method of commission (submitting bills, reports and records). Plaintiff alleges that each predicate act was related to the others insofar as each one was the result of a common plan, consistently applied using standard practices, and producing a consistent result.

140.    Plaintiff was injured in its business and property in an undetermined amount by Defendants' misrepresentations, violations of law, fraudulent conduct and other acts and omissions committed by the Defendants as set forth above in the paragraphs herein. Such injury includes: the deprivation of the ability to conduct the Plaintiff's insurance business on the basis of true, accurate and complete assessments of the numbers and amounts of legitimate compensable claims; the loss of monies paid pursuant to and/or a result of false, fraudulent, inflated and/or misrepresented claims for medical benefits, uninsured motorist benefits, underinsured motorist benefits and liability for bodily injury; the expenses incurred in the review, adjustment and payment of the claims created and supported through the conspiracy and scheme; the losses and financial expenses which have been and now are being incurred to create, establish and carry out systems and policies to detect and discover false, fraudulent and inflated claims; the hiring of claims adjusters, consultants and attorneys to detect and rebut said claims and other injury as may be proved at the trial hereof. The relief sought by Plaintiff against Defendants includes compensatory damages, payments made by Plaintiff to Defendants and individuals allegedly treated by Defendants, claims handling expenses,  treble damages pursuant to 18 U.S.C.§ 1964(c), costs of investigation and suit, interest and attorneys' fees.

38

## V.    The Fraudulent HCFA-1500 Forms and other Medical Documentation Submitted to State Farm

141.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault

Benefits (i.e. HCFA-1500 Forms) consistently have been submitted to State Farm by and on

behalf of the Defendants since April 4, 2002 seeking payment for services for which the PC

Defendants are ineligible to receive payment.

142.    The HCFA-1500 Forms submitted to State Farm by and on behalf of the

Defendants are false and misleading in the following material respects:

(i)     The HCFA-1500 Forms uniformly misrepresented to State Farm that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not properly licensed in that they are medical professional corporations that were unlawfully incorporated and which, in reality, have been owned and controlled by the Management Defendants who are not physicians and who owned and controlled the PC Defendants for their economic benefit, while designating Dr. Miller or Dr. Giovanelli as the nominal or straw owners.

(ii)    The HCFA-1500 Forms uniformly misrepresented to State Farm that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not properly licensed in that they are medical professional corporations that engaged in unlawful fee splitting with the Management Defendants who are not physicians.

(iii)   The HCFA-1500 Forms uniformly misrepresented to State Farm that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants were not properly licensed in that they are not, and never have been, owned by physicians who actually practice medicine through the professional corporations.

(iv)    The HCFA-1500 Forms, medical, chiropractic, physical therapy and acupuncture notes, testing and reports submitted by the Defendants misrepresented to State Farm that the treatment and testing identified therein and purported to have been given was medically necessary, when, in fact, it was not.

39

## VI.    **The Defendants' Fraudulent Concealment**

143.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to State Farm.

144.    To induce State Farm to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

145.    Specifically, they knowingly misrepresented and concealed facts related to the PC Defendants in an effort to prevent discovery that the professional corporations are unlawfully incorporated, purport to be owned by physicians who do not actually practice through them, actually are owned and controlled by non-physicians, engage in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits.

146.    For example, the Management Defendants entered into complex financial arrangements with the Nominal Owner Defendants and the PC Defendants that were designed to, and did, conceal the Management Defendants' true ownership of and control over the PC Defendants.

147.    Additionally, the Defendants misrepresented Dr. Miller's and Dr. Giovanelli's (as well as Dr. Lovett's) ownership of and control over the PC Defendants in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit medicine to be practiced through the PC Defendants.

148.    Likewise, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that the PC Defendants were properly incorporated,

lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

149.    Moreover, in every bill that the Defendants submitted or caused to be submitted for Fraudulent Services purportedly performed by Dr. Miller at Royal Medical and RPMS, the Defendants uniformly misrepresented that Dr. Miller actually performed the services in question, when in fact he did not. The Defendants misrepresented Dr. Miller's role in performing the Fraudulent Services in order to create the false appearance that Dr. Miller actually practiced through Royal Medical and RPMS, when in fact he did not.

150.    The Defendants created multiple professional corporations with different tax identification numbers in order to reduce the amount of billing submitted through any single professional corporation, and thereby prevent State Farm from identifying the pattern of fraudulent charges submitted through any one entity.

151.    The Defendants systematically obstructed State Farm's attempts to obtain information necessary to verify the PC Defendants' corporate legitimacy and eligibility to bill for or to collect No-Fault Benefits.  For example:

(i)     Despite State Farm's requests, the Defendants ensured that the Defendants never produced Dr. Giovanelli for an examination under oath.

(ii)    Defendants also fraudulently incorporated RPMS to avoid further requests from insurance companies, to avoid the uncovering of their scheme, and to have a second vehicle through which they could continue to submit fraudulent No-Fault claims.

(iii)   When State Farm requested documents and an examination under oath from RPMS, the Defendants ensured that RPMS never produced the documents or a witness.

(iv)    The Management Defendants and Dr. Giovanelli fraudulently incorporated RPMC, to avoid further requests from insurance companies, to avoid the uncovering of their scheme, and to have a third vehicle through which they could continue to submit fraudulent No-Fault claims.

152.    The Defendants' strategy therefore is as follows: Submit fraudulent billing through a fraudulently incorporated professional corporation, refuse to provide information requested by insurers, then fraudulently incorporate a new professional corporation when it appears that insurers' requests will make it impossible to continue submitting billing through the previous professional corporation.

153.    State Farm is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent concealment described above, were designed to and did cause State Farm to rely upon them.

154.    As a result, State Farm has incurred damages of more than $1,659,773.00 based upon the fraudulent charges representing payments made by State Farm on or after April 4, 2002.

155.    Based upon the Defendants' material misrepresentations, concealment, and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

156.    Furthermore, as the result of the Defendants' misrepresentations and acts of concealment, State Farm did not know, and could not have known, that it had a cause of action against the Defendants until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the PC Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

157.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 156 above.

42

158.    There is an actual case in controversy between State Farm and the PC Defendants regarding more than $500,000.00 in fraudulent billing that has been submitted to State Farm.

159.    The PC Defendants have no right to receive payment for any bills submitted to State Farm or future bills submitted because they are fraudulently incorporated and are owned and controlled by persons not licensed to practice medicine in New York State and, therefore, are ineligible to seek or recover No-Fault Benefits.

160.    The PC Defendants have no right to receive payment for any bills submitted to State Farm or future bills submitted because the professional corporations engaged in unlawful fee-splitting with unlicensed individuals and entities.

161.    The PC Defendants have no right to receive payment for any bills submitted to State Farm or future bills submitted because the PC Defendants are not, and never have been, owned by physicians who actually practice medicine through the professional corporations.

162.    Accordingly, State Farm requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     Royal Medical, P.C., Rego Park Medical Services, P.C., and Rego Park Medical Care, P.C. have no right to receive payment for any bills submitted to State Farm or future bills submitted because these professional corporations are fraudulently incorporated, owned and/or controlled by non-physicians and, therefore, are ineligible to seek or recover No-Fault Benefits;

(ii)    Royal Medical, P.C., Rego Park Medical Services, P.C., and Rego Park Medical Care, P.C. have no right to receive payment for any bills submitted to State Farm or future bills submitted because these professional corporations engaged in unlawful fee splitting with non-physicians; and

(iii)   Royal Medical, P.C., Rego Park Medical Services, P.C., and Rego Park Medical Care, P.C. have no right to receive payment for any bills submitted to State Farm or future bills submitted because Royal Medical, P.C., Rego Park Medical Services, P.C., and Rego Park Medical Care, P.C. are not, and never have been, owned by physicians who actually practice medicine through the professional corporations.

## SECOND CAUSE OF ACTION
### Against Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell
### (Common Law Fraud)

163.   State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 162 above.

164.   Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell intentionally and knowingly made false and fraudulent statements of material fact to State Farm and concealed material facts from State Farm in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

165.   The false and fraudulent statements of material fact and acts of fraudulent concealment include, but are not limited to, the facts alleged throughout and the following: (i) in every claim, the representation that Royal Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-physicians; (ii) in every claim, the representation that Royal Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation was engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that Royal Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Royal Medical was not owned by physicians who actually practiced through the professional corporation; (iv) in every claim, treatment, testing, consultations, and referrals were identified as medically necessary, when in fact, they were not.

166.    Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce State Farm to pay charges submitted through Royal Medical that were not compensable under the No-Fault Laws.

167.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid at least $419,000.00 pursuant to the fraudulent bills submitted by the Defendants through Royal Medical.

168.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles State Farm to recover punitive damages.

169.    Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell
### (Unjust Enrichment)

170.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 169 above.

171.    As set forth above, Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State Farm.

172.    When State Farm paid the bills and charges submitted by or on behalf of Royal Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

45

173.    Royal Medical, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell have been enriched at State Farm's expense by State Farm's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

174.    Defendants' retention of State Farm's payments violates fundamental principles of justice, equity and good conscience.

175.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $419,000.00.

## FOURTH CAUSE OF ACTION
### Against RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell
### (Common Law Fraud)

176.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 175 above.

177.    RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell intentionally and knowingly made false and fraudulent statements of material fact to State Farm and concealed material facts from State Farm in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

178.    The false and fraudulent statements of material fact and acts of fraudulent concealment include, but are not limited to, the facts alleged throughout and the following: (i) in every claim, the representation that RPMS was properly licensed, and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-physicians; (ii) in every claim, the representation that RPMS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

46

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation was

engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that

RPMS was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to

Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact RPMS was not

owned by physicians who actually practiced through the professional corporation; (iv) in every

claim, treatment, testing, consultations, and referrals were identified as medically necessary,

when in fact, they were not.

179.    RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell intentionally made the

above-described false and fraudulent statements and concealed material facts in a calculated

effort to induce State Farm to pay charges submitted through RPMS that were not compensable

under the No-Fault Laws.

180.    State Farm has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $93,000.00 pursuant to the fraudulent bills submitted

by the Defendants through RPMS.

181.    The Defendants' extensive fraudulent conduct demonstrates a high degree of

moral turpitude and wanton dishonesty that entitles State Farm to recover punitive damages.

182.    Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory

and punitive damages, together with interest and costs, and any other relief the Court deems just

and proper.

### FIFTH CAUSE OF ACTION
**Against RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell**
**(Unjust Enrichment)**

183.    State Farm incorporates, as though fully set forth herein, each and every

allegation in paragraphs 1 through 182 above.

47

184.    As set forth above, RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell
have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State
Farm.

185.    When State Farm paid the bills and charges submitted by or on behalf of RPMS
for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments
based on the Defendants' improper, unlawful, and/or unjust acts.

186.    RPMS, Dr. Giovanelli, Dr. Miller, F. Giovanelli, and Janell have been enriched at
State Farm's expense by State Farm's payments which constituted a benefit that Defendants
voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

187.    Defendants' retention of State Farm's payments violates fundamental principles
of justice, equity and good conscience.

188.    By reason of the above, the Defendants have been unjustly enriched in an amount
to be determined at trial, but in no event less than $93,000.00.

**SIXTH CAUSE OF ACTION**
**Against RPMC, Dr. Giovanelli, F. Giovanelli, and Janell**
**(Common Law Fraud)**

189.    State Farm incorporates, as though fully set forth herein, each and every
allegation in paragraphs 1 through 188 above.

190.    RPMC, Dr. Giovanelli, F. Giovanelli, and Janell intentionally and knowingly
made false and fraudulent statements of material fact to State Farm and concealed material facts
from State Farm in the course of their submission of thousands of fraudulent bills seeking
payment for the Fraudulent Services.

191.    The false and fraudulent statements of material fact and acts of fraudulent
concealment include, but are not limited to, the facts alleged throughout and the following: (i) in

48

every claim, the representation that RPMC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-physicians; (ii) in every claim, the representation that RPMC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the professional corporation was engaged in illegal fee-splitting with non-physicians; (iii) in every claim, the representation that RPMC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact RPMC was not owned by physicians who actually practiced through the professional corporation; (iv) in every claim, treatment, testing, consultations, and referrals were identified as medically necessary, when in fact, they were not.

192.    RPMC, Dr. Giovanelli, F. Giovanelli, and Janell intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce State Farm to pay charges submitted through RPMC that were not compensable under the No-Fault Laws.

193.    State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid at least $20,000.00 pursuant to the fraudulent bills submitted by the Defendants through RPMC.

194.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles State Farm to recover punitive damages.

49

195.     Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against RPMC, Dr. Giovanelli, F. Giovanelli, and Janell
### (Unjust Enrichment)

196.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 195 above.

197.     As set forth above, RPMC, Dr. Giovanelli, F. Giovanelli, and Janell have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State Farm.

198.     When State Farm paid the bills and charges submitted by or on behalf of RPMC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

199.     RPMC, Dr. Giovanelli, F. Giovanelli, and Janell have been enriched at State Farm's expense by State Farm's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

200.     Defendants' retention of State Farm's payments violates fundamental principles of justice, equity and good conscience.

201.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $20,000.00.

## EIGHTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

202.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 201 above.

203.   Royal, RPMS, RPMC, Dr. Giovanelli, F. Giovanelli, individually and d/b/a Village, Janell, individually and d/b/a Village, Dr. Miller, Dr. Amato, Dr. Merchant, and Meridian intentionally and knowingly made false and fraudulent statements of material fact to State Farm and concealed material facts from State Farm in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

204.   The false and fraudulent statements of material fact and acts of fraudulent concealment include, but are not limited to, the facts alleged throughout and the following: (i) in every claim, treatment, testing, consultations, and referrals were identified as medically necessary, when in fact, they were not.

205.   Royal, RPMS, RPMC, Dr. Giovanelli, F. Giovanelli, individually and d/b/a Village, Janell, individually and d/b/a Village, Dr. Miller, Dr. Amato, Dr. Merchant, and Meridian intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce State Farm to pay charges submitted through the Defendant practices, including Meridian, Royal, RPMS, RPMC, and Village that were not compensable under the No-Fault Laws.

206.   State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,659,773.00 pursuant to the fraudulent bills submitted by the Defendants.

207.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles State Farm to recover punitive damages.

208.   Accordingly, by virtue of the foregoing, State Farm is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

209.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 208 above.

210.    As set forth above, Royal, RPMS, RPMC, Dr. Giovanelli, F. Giovanelli, individually and d/b/a Village, Janell, individually and d/b/a Village, Dr. Miller, Dr. Amato, Dr. Merchant, and Meridian have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of State Farm.

211.    When State Farm paid the bills and charges submitted by or on behalf of the Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

212.    Royal, RPMS, RPMC, Dr. Giovanelli, F. Giovanelli, individually and d/b/a Village, Janell, individually and d/b/a Village, Dr. Miller, Dr. Amato, Dr. Merchant, and Meridian have been enriched at State Farm's expense by State Farm's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

213.    Defendants' retention of State Farm's payments violates fundamental principles of justice, equity and good conscience.

214.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,659,773.00.

## TENTH CAUSE OF ACTION
### Against All Defendants
### Violation of RICO, 18 U.S.C.
### §§ 1962(c), 1964(c)

215.    State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 214 above.

216.    State Farm is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

217.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

218.    At all times material to this Complaint, Defendants and other individuals were associated in fact and thus are an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (hereinafter "the enterprise").

219.    At all times material to this Complaint, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways and telephone lines.

220.    At all times material to this Complaint, each Defendant was associated-in-fact although distinct from the enterprise.

221.    At all times material to this Complaint, each Defendant conducted or participated in the conduct of the enterprise's affairs and each Defendant had a role in directing or managing the operations or affairs of the enterprises.

222.    The Defendants who are associated in-fact were not acting in furtherance of the corporate Defendants' legitimate pursuits when committing acts of mail fraud and other wrongful acts as described in this Complaint.

223.    Defendants devised and participated in a scheme to defraud Plaintiffs as set forth above for a number of years continuously.

224.     Each Defendant conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of, but not limited to, the multiple instances of mail and wire fraud as set forth above in paragraphs 134.

225.     These acts of mail fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

226.     The conduct of each of the Defendants constitutes a violation of 18 U.S.C. §1962(c).

227.     Plaintiffs were directly injured in their business and property as set forth above by Defendants' violations of 18 U.S.C. §1962(c).

WHEREFORE, pursuant to 18 U.S.C. §1964(c), Plaintiff demands that judgment be entered in their favor and against all Defendants jointly and severally for compensatory damages, treble damages, exemplary damages, interest, costs, attorneys' fees and such other relief as the court shall find just and equitable and warranted by applicable law.

### ELEVENTH CAUSE OF ACTION
**Against All Defendants**
**Conspiracy To Violate RICO, 18 U.S.C. §1962(c)**
**In Violation Of 18 U.S.C. §1962(d)**

228.     State Farm incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 227 above.

229.     Plaintiff is a "person" within the meaning of 18 U.S.C. §1961(3) and 1964(c).

230.     Each Defendant is a "person" within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

231.     At all times material to this Complaint, Defendants and other individuals were associated in fact and thus are an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c).

232.    At all times material to this Complaint, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways and telephone lines.

233.    At all times material to this Complaint, each Defendant was associated-in-fact although distinct from the enterprise.

234.    Defendants devised and participated in a scheme to defraud Plaintiffs as set forth above continuously for a number of years.

235.    Each Defendant conspired and agreed among themselves and with other co-conspirators to violate 18 U.S.C. §1962(c), that is to conduct or participate directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the numerous acts of mail and wire fraud as set forth above in paragraphs 134.

236.    These acts of mail and wire fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

237.    Said conduct constitutes a violation of 18 U.S.C. §1962(d).

238.    Plaintiffs were directly injured by the Defendants in their business and property as set forth above and described throughout the Complaint.

WHEREFORE, pursuant to 18 U.S.C. §1964(c), Plaintiffs demand that judgment be entered in their favor and against all Defendants jointly and severally for compensatory damages, treble damages, exemplary damages, interest, costs, attorneys' fees and such other relief as the court shall find just and equitable and warranted by applicable law.

## JURY DEMAND

239.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

55

**WHEREFORE**, Plaintiff State Farm Mutual Automobile Insurance Company demands that a Judgment be entered in its favor:

A.      On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any bills submitted to State Farm;

B.      On the Second Cause of Action against Royal Medical, Dr. Miller, Dr. Giovanelli, F. Giovanelli, and Janell, for compensatory damages in favor of State Farm in an amount to be determined at trial but in excess of $419,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Cause of Action against Royal Medical, Dr. Miller, Dr. Giovanelli, F. Giovanelli, and Janell, for more than $419.000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action against RPMS, Dr. Miller, Dr. Giovanelli, F. Giovanelli, and Janell, for compensatory damages in favor of State Farm in an amount to be determined at trial but in excess of $93,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against RPMS, Dr. Miller, Dr. Giovanelli, F. Giovanelli, and Janell, for more than $93,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against RPMC, Dr. Giovanelli, F. Giovanelli, and Janell, for compensatory damages in favor of State Farm in an amount to be determined at trial but in excess of $20,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

56

G.      On the Seventh Cause of Action against RPMC, Dr. Giovanelli, F. Giovanelli, and Janell, for more than $20,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

H.      On the Eighth Cause of Action against all the Defendants, for compensatory damages in favor of State Farm in an amount to be determined at trial but in excess of $1,659,773.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

I.      On the Ninth Cause of Action against all the Defendants, for more than $1,659,773.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

J.      On the Tenth Cause of Action  against all the Defendants, jointly and severally for compensatory damages for more than 1,659,773.00, treble damages, exemplary damages, interest, costs, attorneys' fees and such other relief as the court shall find just and equitable and warranted by applicable law.

K.      On the Eleventh Cause of Action  against all the Defendants, jointly and severally for compensatory damages for more than 1,659,773.00, treble damages, exemplary damages, interest, costs, attorneys' fees and such other relief as the court shall find just and equitable and warranted by applicable law.

GOLDBERG, MILLER & RUBIN, P.C.

BY:   _____
Cy Goldberg (CG 1287)
121 S. Broad Street
Suite 1500
Philadelphia, Pennsylvania 19107
(215) 735-3994
*Counsel for Plaintiff*
*State Farm Mutual Automobile Insurance Company*

DATED: July 6, 2012

57